Honorable David G. Estudillo

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ANDREW DEVIVO, on his own behalf and on behalf of all others similarly situated,

Plaintiff,

v.

SHEEX INC.,

Defendant.

No. 3:25-cv-05807-DGE

**PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE**

## **INTRODUCTION**

This Court directed the parties to show cause why this action should not be remanded to state court for lack of subject matter jurisdiction. As the Court noted in its Order (Dkt. No. 28 at 3 and 5), the burden of establishing federal jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and the existence of a case or controversy under Article III lies with Defendant.[1] Even so, Plaintiff respectfully submits that remand is not required. The amount in controversy exceeds CAFA's $5 million threshold because each unlawful email sent under

_____

[1] By removing this action, Defendant necessarily represented that the requirements of Article III—including standing—are satisfied. *See Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 682-85 (9th Cir. 2006). To the extent that Defendant contends Article III standing is now lacking, the court must remand immediately due to Defendant no longer meeting the removal requirements.

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

1

Washington's Commercial Electronic Mail Act ("CEMA") constitutes a separate violation of the law. Because Plaintiff has alleged receipt of deceptive commercial emails in violation of CEMA, Article III standing is also established. Accordingly, the Court should discharge the Order to Show Cause and retain jurisdiction in this matter.

## ARGUMENT

### I.    Article III Standing is Satisfied Because Plaintiff Alleges Concrete Injuries.

Of course, Article III standing requires a concrete injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). The Court has requested clarification as to whether Plaintiff has alleged a sufficiently concrete injury to establish Article III standing. He has. At first glance, receipt of deceptive spam emails may not resemble the tangible injuries at issue in a criminal proceeding or commercial business litigation. Still, federal courts consistently confirm their authority to hear disputes stemming from injuries like invasion of privacy, nuisance, or intrusion upon seclusion. Spam emails are a special type of annoyance. They flood our inboxes, consume time to cull and delete, and when the information they contain is false or misleading, they serve a more nefarious purpose – they *deceive*. Through CEMA, the Washington legislature created a remedy for residents in receipt of commercial emails that contain misleading or deceptive information in their subject headings. Plaintiff alleges that he received deceptive commercial emails in violation of CEMA, which constitutes a concrete injury under relevant authority.

Standing under Article III does not require a tangible injury. The Supreme Court has observed that a plaintiff may satisfy the injury-in-fact requirement by alleging intangible harms. *Spokeo, Inc.*, 578 U.S. at 340 ("Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete"). Accordingly, actions to remedy "invasions of privacy, intrusion upon seclusion, and

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

2

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
TEL. 615.254.8801

nuisance have long been heard by American courts, and the right of privacy is recognized by most states." *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017). As with unwanted calls and texts, the receipt of unwanted or unlawful spam emails are an "unwanted intrusion and nuisance" on consumers. *See id.* (finding that plaintiff established a concrete injury-in-fact for their Telephone Consumer Protection Act claim) ("Congress sought to protect consumers from the unwanted intrusion and nuisance of unsolicited telemarketing phone calls and fax advertisements."); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954-55 (9th Cir. 2009). These are the types of harm which CEMA seeks to prevent. Just as the TCPA "establishes the substantive right to be free from certain types of phone calls and texts absent consumer consent[,]" *Van Patten* at 1043, CEMA protects Washington residents from the nuisance, confusion, and annoyance caused by deceptive spam emails.

As the Ninth Circuit has emphasized, "spam is largely considered a nuisance and a source of frustration to e-mail users who. . . must wade through inboxes clogged with messages peddling assorted, and often unwanted, products and services. *The rising tide of spam poses an even greater problem to businesses, institutions, and other entities through network slowdowns, server crashes, and increased costs.*" *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1044–45 (9th Cir. 2009). Clogging people's inboxes with junk mail is one thing – but clogging consumer inboxes with *deceptive* spam is another.

So, this case is not about some purely technical statutory violation, but rather concrete harm resulting from the receipt of deceptive spam emails. It is materially different from cases involving "bare procedural violations." *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426-27 (2021). The Supreme Court has distinguished purely procedural violations, where standing is lacking, and statutory violations that result in real harm or a material risk of harm. *Id.* Where a plaintiff is

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

3

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
TEL. 615.254.8801

directly exposed to the very harm that a statute was designed to prevent, standing is satisfied. *See id.* That is precisely the case here. The CEMA violations which Plaintiff identifies in his Complaint, Dkt. No. 1-1, are not premised upon technical defects, divorced from real-world harm. CEMA prohibits the transmission of commercial emails containing false or misleading information and Plaintiff alleges that he was personally subjected to those deceptive communications. The injury is not hypothetical or procedural; it occurs upon receipt of each unlawful transmission. These communications exposed Plaintiff to misleading information and required Plaintiff to expend time and attention reviewing and managing unlawful emails. These are real-world harms.

CEMA's structure and text confirm that Washington's legislature sought to remedy real, recipient-focused harms which arise from deceptive commercial emails. The statute makes it unlawful to "initiate the transmission" of a commercial electronic mail message that contains false or misleading information in its subject line and provides damages "to the recipient" of such messages. Wash. Rev. Code. §§ 19.190.020(1), (1)(b) and 19.190.040. By tying liability and recovery to the transmission and receipt of unlawful emails, the statute demonstrates a clear legislative judgment that such communications inflict direct harm on recipients. That judgment, of course, is based on the nature of these spam emails—where subject headings are the only means of assessment for consumers hoping to temper the barrage of value-less and time-wasting communications. As the Supreme Court of Washington opined, construing the meaning and purpose of CEMA:

> CEMA sought to give consumers relief from commercial spam e-mail by requiring accuracy and truthfulness in the subject lines of such e-mails. The legislature sought to achieve this objective by targeting an e-mail's header and subject lines: the two pieces of information consumers first glean when faced with the choice of deleting a message or engaging with its content.

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

4

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
TEL. 615.254.8801

*Certification from United States Dist. Ct. for W. Dist. of Washington in Brown v. Old Navy, LLC*, 4 Wash. 3d 580, 590–91 (2025) (en banc).

In *Brown*, the Washington Supreme Court observed that the injury under CEMA occurs when a recipient receives an email that violates the statute. *Id.* at 584 ("Under CEMA, the injury is receiving an e-mail that violates its regulations."). This confirms that the harm is neither procedural nor abstract; it arises from the recipient's real-world experience of receiving the violative communication. Under federal standing doctrine, this recognition is critical as it identifies a specific and concrete event—the receipt of an unlawful message—as the point at which injury occurs. Plaintiff experienced this precise injury when he received Defendant's marketing emails containing misleading statements in their subject line.

To the extent that Defendant has raised concerns regarding the absence of reliance or economic injury, those considerations do not defeat Article III standing. Article III requires that plaintiffs allege a concrete injury, not that they prove every element of a statutory or common law claim. *See Spokeo, Inc.*, 578 U.S. at 338. Intangible harm may be concrete even where economic loss has not been established. *See TransUnion LLC*, 594 U.S. at 425. In *Van Patten*, 847 F.3d at 1043, the Ninth Circuit found that receipt of unlawful communications was itself a concrete injury without reference to plaintiff's monetary loss. Nor must plaintiffs allege reliance on the deceptive content of the emails. The injury under CEMA occurs when the violative email is received and the recipient is exposed to misleading information. *See Brown*, 4 Wash. 3d at 584. Thus, reliance and economic loss are not required to establish standing under Article III.

CEMA is a substantive consumer protection statute meant to prevent deceptive intrusions into the inboxes of Washington residents and to compensate Washington residents for the harms those deceptions cause. That is why the Washington legislature explicitly related CEMA to the

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
TEL. 615.254.8801

State's Consumer Protection Act. Wash. Rev. Code Ann. § 19.190.100. Plaintiff's allegations, that he received deceptive commercial emails in violation of CEMA, fall squarely within the harm which the statute was enacted to address. Because Plaintiff has alleged concrete injuries sufficient to satisfy Article III, remand on standing grounds is not required.

## II.    The Amount in Controversy Exceeds $5 Million Under CAFA.

Under CAFA, removal is proper if the amount in controversy exceeds $5 million in the aggregate. 28 U.S.C. § 1332(d)(2), (d)(6). That threshold is satisfied here because each unlawful email sent under Washington's Commercial Electronic Mail Act ("CEMA"), Wash. Rev. Code. § 19.190.020, constitutes a separate violation of the law. CEMA's plain text and structure support this per-email interpretation.

A per-recipient limitation on damages is inconsistent with the statutory text. To begin, CEMA's liability provision defines the prohibited conduct in terms of each unlawful transmission. The statute makes it unlawful to "initiate the transmission" of a commercial electronic email that contains false or misleading information in its subject line. *Id.* at (1)(b). The prohibited act, as defined by CEMA, is the sending of each noncompliant email. The statutory violation is thus complete at the moment a noncompliant email is transmitted. The statute expressly uses the phrase "a commercial electronic mail message." The use of the "a" is telling – liability does not attach once some threshold is reached, but upon "a" single email. Because liability attaches to each unlawful transmission, each email constitutes a separate CEMA violation. The amount in controversy must therefore be evaluated based on the number of violative emails sent to Washington residents during the class period. Had Washington's legislature intended to collapse every unlawful transmission sent to a Washington resident into a singular violation and basis for recovery, it could have defined the prohibited conduct in such a way. But that is not the statute we

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

6

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
TEL. 615.254.8801

have here. CEMA's liability provision does not contemplate any approach other than a per-email model of recovery.

CEMA's statutory damages provision also contemplates a per-violation measure of recovery. CEMA provides that "[d]amages to the recipient of a commercial electronic mail message … are five hundred dollars, or actual damages, whichever is greater." Wash. Rev. Code. § 19.190.040(1). This language establishes a statutory minimum recovery for each actionable harm. It identifies who may recover—the recipient—without placing any restrictions on the number of violations which that recipient may pursue recovery for. Noticeably absent from the provision is any language imposing a per-recipient limitation on damages. Nothing in the text suggests that multiple unlawful emails sent to the same recipient collapse into a single compensable event. Repetition of the same phrase used in the liability provision, "a commercial electronic mail message," is also significant. The provision is concerned with a single violative email, not every violative email that a sender has transmitted to the recipient's inbox. Again, had the legislature intended a per-recipient recovery scheme, it could have enacted a damages provision specifying a single recovery for all instances of violative conduct which a Washington resident experiences. The absence of limiting language is especially significant here since the drafters were legislating in the area of electronic communications where repeated violations are easily foreseeable. Instead, CEMA's damages provision is drafted to address each discrete instance where a Washington resident receives a single "commercial electronic mail message." *Id*. This approach is supported by the Washington Supreme Court's opinion in *Brown v. Old Navy, LLC*, 4 Wash. at 584, where it emphasized that the injury under CEMA is "receiving an email that violates its regulations." Since injury under CEMA occurs upon receipt of each unlawful email, each transmission gives rise to a distinct claim and separate statutory damages.

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

7

Reading CEMA's liability and damages provision as a whole confirms that each unlawful email is a separate violation giving rise to damages. In Washington, statutes are construed and interpreted to give effect to each provision so that no portions are rendered meaningless. *See State v. Roggenkamp*, 153 Wn. 2d 614, 623-24 (2005). When interpreting statutory terms, courts should "take into consideration the meaning naturally attaching to them from the context, and [ ] adopt the sense of the words which best harmonizes with the context." *State v. Jackson*, 137 Wn. 2d 712, 729 (1999). Under this approach, CEMA's damages scheme is straightforward. The liability provision at Wash. Rev. Code. § 19.190.020 defines the prohibited conduct as initiating the transmission of a commercial electronic mail message which contains a false or misleading subject line. The damages provision at Wash. Rev. Code. § 19.190.040 provides statutory damages to the recipient of a violative commercial electronic mail message. These provisions operate together. The liability provision identifies the act that violates the statute—transmission of an email with a violative subject line—while the damages provision establishes the remedy available for that transmission. Thus, the most natural and coherent reading of the statute presents a per-violation framework: each violative email gives rise to statutory damages recoverable by the recipient.

This makes sense. The alternative does not. If damages were limited to a single recovery per recipient regardless of the number of unlawful emails sent, CEMA's statutory scheme would collapse. Under a per-recipient interpretation, multiple unlawful transmissions to the same recipient would be treated as a single compensable event. Consequently, the statute would recognize multiple violations but provide only a single recovery regardless of how many violations occurred. That disconnect would sever the relationship between liability and damages and render the statute's focus on each act of transmission largely meaningless. As discussed above, Washington law does not embrace such results. *See Roggenkamp*, 153 Wn. 2d at 624. The proper

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

8

interpretation must harmonize the statute's provisions. The per-email interpretation does exactly that. It maintains CEMA's structure by ensuring that each prohibited act is recognized as a violation and each violation carries a corresponding remedy. Since this approach gives coherent effect to both the liability and damages provisions, it is the correct reading of CEMA.

As CEMA uses singular language in its damages provision, a per-recipient limitation on damages conflicts with the plain text. Wash. Rev. Code. § 19.190.040 provides damages for the recipient of "a commercial electronic mail message" sent in violation of CEMA. Thus, the provision ties damages to each violative message rather than to a recipient in the aggregate. This singular phrasing should be given effect. If Washington's legislature intended to restrict recipients to a single recovery, it must rewrite the provision to include all messages received rather than "a" single violative message.

The Washington legislature had every right and reason to regulate deceptive commercial emails in this way. Consumers (and constituents) do not like spam. CEMA neither discourages nor encumbers the use of commercial emails to advertise products and services– it merely prohibits lying about pertinent information (like the duration and availability of a promotion) in such advertising. Legislatures have regulated false and deceptive advertising for decades. CEMA simply provides incentive for retailers to avoid false and misleading representations in the subject line of their marketing emails by making such communications unlawful. A per-email damages regime is an appropriate exercise of legislative power to discourage the use of these anti-consumer tactics.

A per-recipient approach, by contrast, would create perverse incentives and hamper CEMA enforcement. Capping damages under a per-recipient rule allows a sender to repeatedly target the same recipient with unlawful emails while facing no additional statutory exposure beyond the first

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

9

violation. Recipients would be allowed a single recovery even though the injuries that CEMA might ameliorate—annoyance, confusion, exposure to deception, and wasted time—occur *each time* a violative email is received. Repeated misconduct would be discounted as a result and exposure would hinge on how broadly emails are distributed rather than how many violations the sender committed. This approach would effectively nullify CEMA's remedial and deterrent functions. In practice, a per-recipient scheme would produce arbitrary results depending upon how a sender designs its email marketing campaign. For example, a sender who distributes a single unlawful email to 500,000 recipients would face greater exposure than a sender who sends daily unlawful emails to the same 5,000 people for an entire year. The more coherent interpretation treats each unlawful email as a separate violation. This per-email approach ensures results that are proportionate to the sender's conduct. It also results in a predictable framework where liability attaches to each prohibited act, damages may scale commensurate with the number of violations, repeat misconduct is deterred, and consumers are compensated for repeated violations.

A consideration of the historical context in which CEMA was drafted also supports a per-email framework. CEMA was enacted in 1998 at a time when Washington's legislature "was specifically concerned about the growing 'volume' of commercial e-mails." *Brown v. Old Navy, LLC*, 4 Wash. at 583. At that time, the price of internet for many consumers was informed by bandwidth and how much time they spent online. "The legislature was concerned about the added cost consumers faced when a barrage of commercial e-mails meant that they paid internet providers for time spent sifting through in-boxes cluttered by spam." *Id.* So, when enacting CEMA, the legislature was addressing the cumulative burden that repeated emails place upon consumers. A per-recipient cap would have undermined their efforts by permitting senders to transmit unlimited

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

10

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
TEL. 615.254.8801

repeat emails to the same Washington resident without additional statutory consequences. It's unlikely that CEMA's drafters would have intended such a loophole.

A recent decision from the Washington Court of Appeals is also instructive. Although *State v. Meta Platforms, Inc.*, 33 Wn. App. 2d 138 (2024) arises under the Fair Campaign Practices Act ("FCPA"), it provides guidance for determining the proper unit for liability and damages under CEMA. In *Meta*, the State alleged that the defendant committed multiple violations of the FCPA's disclosure requirements. *Id.* at 194. The court observed that the disclosure law permits a penalty for each violation but "does not affirmatively define the term 'violation' or provide a specific method for calculating the number of violations in a particular case." *Id.* The defendant argued that damages should be informed by the number of unfulfilled disclosure requests. *Id.* at 196. The court disagreed, concluding that damages should be calculated on a per-item (each discrete advertising-related violation) basis, stating that "the plain language of the disclosure law evidences its intent to preserve and sunlight relevant data of each individual ad on Meta's social media platforms, without any requirement that any particular voter or the government step into the sunlight to inspect the records." *Id.* at 197. Thus, the appellate court recognized that each discrete failure to comply with the FCPA constituted a separate violation of the law, giving rise to cumulative penalties. The distinction is critical as the court effectively refuted a per-recipient (per-requester) rule and embraced a per-act approach to liability where the number of violations is informed by the number of times the defendant engaged in the prohibited conduct.

CEMA presents this same structural question: does the law impose one recovery per recipient regardless of how many unlawful emails are transmitted or does it impose one violation per unlawful transmission. Under *Meta's* approach, the answer depends upon the unit of conduct that the statute regulates. Applying that logic to the present matter, CEMA regulates the act of

initiating the transmission of an email with a deceptive subject line. Every time that a defendant sends a violative email, it commits a new and distinct statutory violation, just like each failure to disclose in *Meta* constituted a separate FCPA violation. Thus, *Meta* confirms that Washington courts are not prone to collapse multiple violations into a single recovery merely because they involve the same party. Instead, penalties and damages scale commensurate with the number of statutory violations committed.

Under the proper per-email framework, the amount in controversy for the present matter exceeds CAFA's $5 million threshold. At this early stage in the case, Plaintiff's calculation must rely on the estimates provided by Sheex in its Notice of Removal. Defendant's removal relied on its own records estimating the number of commercial emails transmitted to Washington residents during the class period. (Dkt. No. 1 at 6). Applying CEMA's statutory damages provision to the estimates provided, each unlawful email constitutes a violation; each violation carries $500 in statutory damages (or actual damages, if greater); and the resulting aggregate exposure exceeds $5 million based on the figures which Defendant provided.[2]

Because the amount in controversy exceeds $5 million under the only plausible interpretation of CEMA, CAFA jurisdiction exists and remand is not warranted.

III.    **Jurisdictional Discovery is Appropriate Prior to Remand.**

If the Court has remaining questions regarding standing or the amount in controversy, Plaintiff respectfully suggest that limited jurisdictional discovery would be appropriate before remand, particularly where relevant information is within Defendant's exclusive control. In the Ninth Circuit, jurisdictional discovery may be permitted where more "fully developed facts are

---

[2] Specifically, Plaintiff proceeds through the same calculation and arrives at same $6 million figure which the Court recounts in its Order. Dkt. 28 at 5.

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

12

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
TEL. 615.254.8801

necessary." *Laub v. U.S. Dept. of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (finding that jurisdictional discovery is proper where "pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.") (internal citations omitted). Here, key jurisdictional issues such as the number of emails sent, the number of Washington residents who received emails, and the nature of Defendant's email practices are uniquely within Defendant's control. Limited discovery focused on these issues would allow the Court to resolve jurisdictional questions based upon a developed factual record rather than Defendant's estimations. Accordingly, if the Court is not prepared to discharge the Order to Show Cause based on the current record, Plaintiff respectfully requests leave to conduct targeted jurisdictional discovery prior to any remand determination.

**IV.      If Article III Standing is Lacking, the Proper Remedy is Remand, Not Dismissal.**

If the Court concludes that Article III standing has not been established, then the only proper course is a remand to state court, not dismissal. Under 28 U.S.C. § 1447(c), "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." The statute expressly uses the word "shall." The Ninth Circuit has confirmed that this directive is mandatory. *See Polo v. Innoventions International, LLC*, 833 F.3d 1193, 1196-97 (9th Cir. 2000). "Remand is the correct remedy because a failure of federal subject-matter jurisdiction means only that the federal courts have no power to adjudicate the matter." *Id.* at 1196. This rule reflects the fundamental principle that state courts are not bound by Article III limitations and may adjudicate claims that federal courts cannot. *Id.*; *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989). Thus, if the Court determines that Article III standing is lacking, it should remand this action to Washington state court.

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

13

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
TEL. 615.254.8801

## CONCLUSION

Remand is unnecessary because Article III standing has been adequately alleged and the amount in controversy plausibly exceeds $5 million under CAFA. Accordingly, the Court should discharge the Order to Show Cause and retain jurisdiction. Alternatively, if the Court finds jurisdiction to be lacking, remand, not dismissal, is appropriate.

Date: April 2, 2026

Respectfully submitted,

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV, *pro hac vice*
Michael C. Tackeff, *pro hac vice*
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com

/s/ Samuel J. Strauss
Samuel J. Strauss, WSBA #46971
Raina C. Borrelli, *pro hac vice* forthcoming
STRAUSS BORRELLI, LLP
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
(872) 263-1100
sam@straussborrelli.com
raina@straussborrelli.com

Lynn A. Toops, *pro hac vice*
Natalie A. Lyons, *pro hac vice* forthcoming
Ian R. Bensberg, *pro hac vice* forthcoming
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

14

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
TEL. 615.254.8801

ibensberg@cohenmalad.com

Walter M. Smith
SMITH & DIETRICH LAW OFFICES PLLC
1226 STATE AVE NE, STE 205
OLYMPIA, WA 98506
Tel.: 360-915-6952
walter@smithdietrich.com

***Attorneys for Plaintiff and the Proposed Class***

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

15

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
TEL. 615.254.8801

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to all attorneys of record.

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV, *pro hac vice*

**Attorney for Plaintiff and the Proposed Class**

PLAINTIFF'S RESPONSE TO
SHOW CAUSE ORDER
(3:25-cv-05807-DGE)

16

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
TEL. 615.254.8801